**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANTHONY HOUSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 09 C 3217** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **MICHAEL J. ASTRUE,** | ) | **Maria Valdez** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Anthony House's claim for Disability Insurance Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, House's motion for summary judgment [Doc. No. 45] is denied, and the Commissioner's cross-motion for summary judgment [Doc. No. 52] is granted.

## BACKGROUND

### I.    PROCEDURAL HISTORY

House originally applied for Disability Insurance Benefits on July 6, 2005, alleging a disability since November 29, 2001 due to osteoarthritis in the feet and back strain. (R. 73.) The application was denied on August 30, 2005 and upon reconsideration on September 13, 2006. (R. 73-79, 81.) House filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on April 16,

2008. (R. 22-72.) House personally appeared and testified at the hearing and was represented by counsel. (*Id*.) House's wife and a vocational expert also testified at the hearing. (*Id*.)

On October 20, 2008, the ALJ denied House's claim for benefits and found him not disabled under the Social Security Act. (R. 12-21.) The Social Security Administration Appeals Council denied House's request for review on May 8, 2009, (R. 1-3), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. <u>Background</u>

House was born on May 30, 1957, and was fifty years old at the time of the ALJ hearing. (R. 26, 113.) He is five feet nine inches tall and weighs around 180 pounds. (R. 26.) House lives with his wife and three children. (R. 277.) He dropped out of school in the eleventh grade and did not obtain a GED. (R. 26, 29-30, 277.) He was in the Army Reserve for three months in 1975 and received an honorable discharge. (R. 30-31, 276.) House was previously employed as a security guard and a custodian. (R. 129.) His prior employment in custodial work involved maintenance, loading and unloading, and lifting as much as 100 pounds or more. (R. 130-33.)

House alleges a disability onset date of November 29, 2001 due to various impairments including lower back pain, foot pain, chest pain, Type 2 diabetes,

2

cellulitis, and headaches. (R. 183-88, 194-97, 218, 228, 277.) In his form seeking
reconsideration of the initial denial of benefits, House added that he had been
afflicted with mental illnesses since 2005. (R. 147.) House has taken or is taking
Vicodin, aspirin, Lasix, and medications for arthritis and high blood pressure. (R.
47-48.)

### B. **Testimony and Medical Evidence**

#### 1. *House's Testimony*

House testified that he has problems with both feet, dating from 2001, when
he had surgery to remove a bone from his foot. (R. 33-34, 37.) He also complained of
swelling and arthritis in his neck, feet, and hands. (R. 33-34.) House claims he has a
problem with a disc in his back, and sometimes when he bends down he cannot get
back up. (R. 35.)

House reported that he has aching and burning pains all over his body, and
nothing relieves the pain. (R. 43-44.) Approximately three times a day, when his
foot starts to get hot, he gets headaches that sometimes last three hours. (R. 47.)
When he gets headaches, he takes aspirin, Vicodin, or arthritis pills. (R. 47-48.)
House also takes Lasix for high blood pressure and another pill for diabetes. (R. 48-
49.) He cannot carry anything heavier than a gallon of milk, and when he does
carry something, it will fall out of his hands. (R. 35, 44.) Over an eight-hour time
period, House cannot walk more than thirty minutes, stand more than twenty-
thirty minutes, or sit for thirty minutes. (R. T4-45.)

For about eight months prior to the hearing, House had been seeing a physician who gave him an ultrasound test, performed blood work, and treated House's high blood pressure. (R. 36.) The doctor did not refer House to any specialists. (*Id.*)

In a typical day, House gets out of bed at 6:00 a.m. and drinks coffee. He walks around for as long as he can, then sits on the couch and sometimes watches movies. (R. 38-39.) He can dress, shower, and shave himself, and he can make something simple to eat. (R. 40.) House does not shop for groceries, nor does he do any chores around the house such as laundry, vacuuming, or dishes. (*Id.*) He is no longer able to play basketball or work on cars, and he does not do any kind of exercise. (R. 40-41.) He attends church every Sunday and has no problem getting along with people there. (R. 42-43.) House claims to have problems with his memory; for example, if he puts his keys down, he cannot find them. (R. 43.)

House reported "see[ing] things in strange places," and stated that in a workplace setting, people would think he was crazy and "wouldn't understand." (R. 41.) He says that at night, he sees "[o]ther places in other worlds." (R. 50-51.) He does not sleep very well and is tired as a result. (*Id.*) He was not receiving and had received no treatment for a mental impairment. (R. 41.)

### 2.    *Elizabeth House's Testimony*

Plaintiff's wife of eighteen years, Elizabeth House, testified at the hearing. (R. 58.) She is a Certified Nursing Assistant and works from 6:00 a.m. to 2:00 p.m. (R. 65.) Elizabeth stated that before Plaintiff got sick, they were active, going to the

4

park and restaurants, visiting family, and exercising, but he no longer can do those things. (R. 58.) She does most of the household chores, and her sons perform maintenance in the home. (R. 59.)

Elizabeth testified that House's memory is not good, and he cannot remember to keep doctors' appointments if she does not remind him. (R. 60.) She said that after drinking his coffee, House will lie down on the couch for fifteen to thirty minutes. (R. 61.) House is able to sit and stand in church, but the service does not last that long. (R. 63.)

### 3.   *Medical and Investigative Evidence*

#### a.   Physical Limitations

The record contains several years' worth of progress notes from Dr. V.R. Kuchipudi, beginning in 2001. (R. 183-235.) The notes describe various symptoms, including lower back and foot pain. Many of the notes are illegible, and Plaintiff has not pointed to any particular notes demonstrating a diagnosis or treatment supporting his claim of disability. Furthermore, House testified that Dr. Kuchipudi "didn't really do nothing" for House's pain, high blood pressure, or arthritis. (R. 36-37.)

House was admitted to La Grange Hospital on January 19, 2002 due to foot pain following an injury at work on November 29, 2001. (R. 257.) House had been wearing a short leg cast for six weeks, and the fracture healed. (*Id.*) The examination revealed a severe painful callosity under the right first metatarsal head, and an x-ray showed a spur on the right first metatarsal head. (*Id.*) Due to

the pain on weight-bearing, the physician recommended osteophytectomy and callectomy, and the surgery was performed the same day. (R. 257, 261-62.) There were no complications, and House left the operating room in good condition. (R. 262.)

X-rays of House's feet were ordered on July 15, 2002 due to his complaints of pain. The radiological findings showed evidence of House's prior surgery but found no lytic or destructive bone lesion or significant degenerative change. (R. 254.) The radiologist concluded that there was no radiographic evidence of acute bony abnormality involving the right foot. The radiologist suggested that if the unexplained bone pain persisted, then further imaging may be appropriate. (*Id.*) The record also contains a March 31, 2005 radiology examination of House's feet, which was ordered by Dr. Kuchipudi. (R. 230.) The radiologist's impression was moderate degenerative arthritis of the first metatarsophalangeal joints of both feet. (*Id.*)

A CT scan of his abdomen and pelvis was conducted on April 4, 2003 based on an indication of abdominal pain and abnormal liver function test as well as hematuria. (R. 233-34.) The examiner's impression was a suggestion of slight thickening of the wall of the urinary bladder, with a notation that it could be a normal finding in a non-distended bladder. The test revealed no other abnormalities. (R. 233.) An April 22, 2004 radiological examination of Plaintiff's liver concluded that there was a suggestion of mild fatty liver, but otherwise no abnormalities were identified. (R. 231.)

6

A physical Residual Functional Capacity ("RFC") assessment was completed by Agency consultant Dr. Robert Patey on August 29, 2005. (R. 266-73.) The RFC limited House to lifting twenty pounds occasionally and ten pounds frequently; standing or walking for about six hours in eight-hour work day; sitting about six hours in an eight-hour workday; and unlimited pushing and pulling. (R. 267.) House had postural limitations of never climbing ladders, ropes, or scaffolds; and occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. (R. 268.) He had no manipulative, visual, or communicative limitations but was to avoid concentrated exposure to fumes or odors. (R. 269-70.) Dr. Patey described the medical evidence in the record and stated that it did not support a claim of total disability. (R. 273.) He noted an August 6, 2005 examination by Dr. Kuchipudi showing that House has chronic low back pain with associated reduced range of motion with no spasms or tenderness, which was characterized as a lumbar strain. (*Id.*) The consultant also mentioned the March 31, 2005 x-ray of House's feet and noted that he walks independently without an assistive device. (*Id.*) He further opined that Plaintiff's headaches are not of the frequency or duration to be totally disabling. (*Id.*)

b. <u>Mental Limitations</u>

After House indicated that he suffered from mental illnesses on his reconsideration form, the DDS referred him for a consultative examination with Dr. Syed Ali, a psychiatrist, which took place on February 27, 2006. (R. 275-78.) House told Dr. Ali that he saw things, including "fallen angels," who talked and "would be

7

killing people." (R. 276.) House's wife reported that he has many sleepless nights, and if he does sleep, it is not more than five hours a night. (*Id*.) He also told her that he sees things, "like a genie thing flying through the house." (*Id*.)

Dr. Ali described House as alert and oriented in all three spheres, with a depressed affect. (R. 277.) His thought content was not delusional, and there was no indication of any derealization or depersonalization. (*Id*.) House incorrectly identified the President of the United States as "President Bush," and when asked to name five large U.S. cities, he responded, "Pennsylvania, Oklahoma, Washington, Illinois, Joliet." (*Id*.) House did name Washington, DC as the location of the White House. (*Id*.) He was unable to serially subtract 7s, starting from 100, and could only remember two out of the five words "dog, apple, chair, room, and grass" in a span of five minutes. (*Id*.) When asked how an apple, an orange, and a banana were alike, House stated that "You can eat them," and he said that if he saw a stamped, addressed envelope with a letter inside it lying on the street, he would leave it there. (*Id*.)

Dr. Ali diagnosed House with psychotic disorder, NOS, with rule-out mental disorder, NOS (secondary to intracranial pathology), and rule-out malingering. (*Id*.) Dr. Ali further stated that if House were found eligible for disability payments, he would not be able to handle the funds in his own interests. (R. 278.)

A Psychiatric Review Technique ("PRT") form was completed by Dr. Donald Cochran on April 13, 2006 and was based on the February 27, 2006 consultative

examination. (R. 288-300.) Under Listing 12.03, the category of schizophrenic, paranoid, and other psychotic disorders, Dr. Cochran found psychotic features and deterioration that are persistent, as evidenced by delusions or hallucinations, as well as incoherence, loosening of associations, illogical thinking, or poverty of content of speech associated with flat affect. (R. 290.) With regard to the "B" criteria of the listings, Dr. Cochran concluded that House had moderate limitations in his activities of daily living; maintaining social functioning; and in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 298.) Dr. Cochran found no evidence of the presence of the "C" criteria. (R. 299.) Dr. Cochran's notes state that House reported depression as well as auditory and visual hallucinations. (R. 300.) Dr. Cochran's mental status examination found no evidence of psychotic process, and House was diagnosed with psychotic disorder NOS, with rule-out malingering, and the report concluded that House would not be capable of even simple work related tasks. (*Id.*) The report ended, however, with a recommendation that a fraud investigation be commenced based upon the diagnosis "and the lack of objective medical evidence to support the allegation." (*Id.*)

Dr. Cochran also completed a mental RFC assessment. (R. 316-19.) The report found House not to be significantly limited in the areas of remembering locations and work-like procedures or understanding, remembering, and carrying out very short and simple instructions, with moderate limitations in understanding and remembering detailed instructions. (R. 316.) House also had moderate limitations in sustaining an ordinary routine without special supervision, working

with others without being distracted, and making simple work-related decisions. (*Id.*) Dr. Cochran reported marked limitations, however, in the areas of carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual; and completing a normal workday without interruptions from psychologically-based symptoms and performing without an unreasonable number of rest periods. (R. 316-17.)

In the area of social interaction, House was not limited in his ability to ask simple questions, get along with co-workers without exhibiting behavioral extremes, or maintain socially appropriate behavior. (R. 317.) House did have moderate limitations in the ability to interact with the general public and to accept instructions and respond appropriately to criticism from supervisors. (*Id.*)

Although House was found to be moderately limited in his ability to travel in unfamiliar places, he had no limitations in the ability to respond appropriately to changes in the work setting, to be aware of normal hazards, or to set realistic goals or make plans independently of others. (*Id.*)

In light of Dr. Cochran's recommendation, the Cooperative Disability Investigations ("CDI") Unit completed a Report of Investigation on August 15, 2006. (R. 280-85.) The report stated that House had been evicted from all addresses known to the investigators, and he was not interviewed by anyone from the CDI. (R. 282.) According to the investigation, despite House's stated inability to leave the house alone or to do yard work, neighbor interviews revealed that he often left home

10

alone and cut the grass. (R. 282.) He had no difficulty communicating and did not appear to have any physical or mental impairments. (R. 283-84.) Neighbors also reported that House did not use a cane, walked his dog every day, and walked normally. (R. 282, 284.) House did not have difficulty climbing the stairs to his apartment, and he was able to carry a bicycle out of his home unassisted. (R. 283.) Another witness stated that when House moved from his home, he carried all the boxes and furniture without difficulty. (R. 284.)

Dr. Terry Travis completed another PRT on September 12, 2006, which was based on Dr. Ali's consultative examination and the CDI report. (R. 302-15.) Dr. Travis's mental status examination concluded that House had a depressed affect, poor judgment, and poor abstraction. (R. 314.) He diagnosed House with psychotic disorder, NOS, with possible malingering. (*Id.*) Dr. Travis further opined that the symptoms described by House and his wife "are not typical of any known mental dis[order]" and that based on the CDI investigation, the consultative examination "is not valid as claimant & wife are prevaricating and dissembling." (*Id.*)

### 4.  *Vocational Expert's Testimony*

William Schweihs testified at the hearing as a Vocational Expert ("VE"). The ALJ asked the VE whether there would be any work available for a hypothetical individual aged 44 to 50; with an 11th grade education and House's past relevant work; who was limited to light work, never climbing ladders, ropes or scaffolds; occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and who must avoid concentrated exposure to pulmonary irritants.

11

(R. 65-66.) The VE responded that maintenance and custodial positions would be ruled out, but House could perform his past relevant work as a security guard. (R. 66.) In addition, the individual could perform approximately 30,000 to 40,000 jobs in the regional economy at the light level, including assembly, packaging, and visual inspection jobs; and at the sedentary level, 20,000 jobs are available. (R. 66-68.) The VE also testified that if the ALJ were to find House credible as to all of his physical symptoms, there would be no jobs available to him. (R. 68.)

C.   **ALJ Decision**

The ALJ found that House had not engaged in substantial gainful employment since the alleged onset date of November 29, 2001. (R. 17.) At step 2, the ALJ concluded that House had severe impairments of arthritis, headaches, obesity, back pain, and degenerative joint disease. (*Id.*) At step 3, the ALJ found that none of House's impairments, alone or in combination, met or equaled a listing. (R. 18.)

The ALJ next determined that House had the RFC to perform light work, subject to the following limitations: no climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling; and no concentrated exposure to pulmonary irritants. (R. 18.) The ALJ concluded that House could perform his past relevant work as a security guard and thus was not disabled under the Social Security Act. (R. 20.)

12

## DISCUSSION

## I.     ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs*., 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II.    JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634

14

(7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III. ANALYSIS

House argues that the ALJ's decision was in error because: (1) his credibility determination was wrong and deprived Plaintiff of his due process rights; (2) the step 2 and step 3 evaluations were incorrect; and (3) the ALJ's RFC determination was flawed.

### A. <u>Credibility</u>

In his ruling, the ALJ found House's subjective complaints not credible in light of the CDI investigation. (R. 20.) House argues that the ALJ's decision to credit the CDI report was in violation of his procedural and substantive process rights to confront witnesses against him, to cross-examine those witnesses and the investigators whose report the ALJ considered, or to present contrary evidence. Plaintiff further contends that he had no prior notice that the issue of the fraud investigation would be raised at the ALJ hearing, which prevented a full and fair

hearing. The Commissioner responds that House has waived the issue, as he never asked for a continuance in order to present contrary evidence or impeach the witnesses or investigators.

First, House does not dispute that he had access prior to the hearing to the entire administrative file, which included the CDI investigative report and Dr. Travis's report concluding that Plaintiff was prevaricating. It defies logic to conclude that Plaintiff was unaware these reports would be relevant to the ALJ's decision.

Second, House's counsel was expressly given an opportunity to take more time to review the record and/or subpoena all needed witnesses, and thus there was no due process violation. In *Richardson v. Perales*, 402 U.S. 389 (1971), the Supreme Court held that a Social Security claimant may not complain that he had no opportunity to cross-examine witnesses if he fails to take advantage of the opportunity to request witness subpoenas. *Id.* at 404-05 (noting that the claimant "was notified that the documentary evidence on file was available for examination before the hearing and, further, a supplemental hearing could be requested"); *see* 20 C.F.R. § 404.950(d)(2) (providing the procedure for a party to request a subpoena at least five days before the hearing date). At the beginning of the hearing, Plaintiff's counsel stated that he was provided a copy of the file on disk while he was on vacation and was only able inspect the disk on the date of the hearing. (R. 25.) The ALJ asked counsel whether he wanted to go forward or needed time to review the

file. Counsel indicated that he would go forward, and that while he "would normally put more time into it," he reviewed as much as he could. (*Id.*)

Furthermore, the ALJ's credibility finding was adequately supported. An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

When assessing the credibility of an individual's statements about symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[1] "This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *1. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own

---

[1] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id*. at *5.

Plaintiff argues that the ALJ's credibility analysis was erroneous because it included a meaningless boilerplate statement[2] and the ALJ failed to consider critical evidence and articulate his reasoning. However, the mere presence of the boilerplate language is insufficient grounds for remand. *See, e.g.*, *Carter v. Astrue*, 413 Fed. Appx. 899, 905-06 (7th Cir. 2011). Here, the use of the boilerplate is, for the most part, incidental. The ALJ adequately supported his credibility finding with reasons, including the CDI report and House's failure to receive any mental health treatment or explain why he did not do so. *See* SSR 96-7p, at *7 (stating that an ALJ must consider an individual's explanations for failing to pursue medical treatment).

House also argues that the ALJ fails to discuss his treating physician's opinions, even though they are entitled to controlling weight. The only functional capacity assessments in the record are from DDS consultants, so it is unclear what opinions Plaintiff relies on. Assuming he is referring to the medical reports, House fails to describe which medical evidence he feels the ALJ should have discussed and

---

[2] The following is the language in question: "Upon considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms. However, the claimant's statements concerning the intensity, duration, and limiting effects of these symptoms are not entirely credible." (R. 18.) This "credibility template" has been subject to criticism because of its meaninglessness and the circular logic that it embraces. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (finding the template "gets things backwards," and is "meaningless boilerplate" that "implies that ability to work is determined first and is then used to determine the claimant's credibility").

how the evidence demonstrates he suffers from disabling injuries. It is not the function of this Court to sift through the administrative record to find Plaintiff's best arguments.

### B.   Step 2

House maintains that the ALJ improperly ascertained his severe impairments at step 2 of the evaluation by failing to include his foot pain. The Commissioner responds that the step 2 determination is merely a screening step in order to determine if further sequential evaluation is necessary.

The Court agrees that the failure to list all impairments at step 2 is not error here. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). Where at least some severe impairments are found, the sequential evaluation continues, and all impairments are then considered in determining the claimant's ability to perform work. *Id.*

### C.   Step 3

House faults the ALJ at step 3 for failing to cite a listing or undertake an analysis of the medical evidence before concluding that he did not suffer from an impairment or combination of impairments that meets or equals a listing. House, however, fails to cite to any listings he believes are met in this case. *See Knox v. Astrue*, 327 Fed. Appx. 652, 655 (7th Cir. 2009) ("Although an ALJ should provide a step-three analysis, a claimant first has the burden to present medical findings that match or equal in severity all the criteria specified by a listing."). The Court will not undertake the burden of reviewing the record and evaluating the medical evidence

in light of all the listings potentially applicable in this case. Moreover, the ALJ relied on several mental and physical DDS consultant evaluations in concluding that none of House's symptoms met or equaled a listing.

### D. RFC Determination

House criticizes the ALJ's adoption of the DDS consultant's RFC because the ALJ failed to conduct a functional evaluation of House's work-related capacities or to consider all the medical evidence.[3] The Commissioner responds that, pursuant to SSR 96-8p, a narrative discussion of a claimant's symptoms and medical source opinions is sufficient. The Court agrees that "an ALJ is not required to provide an item-by-item or function-by-function analysis of the claimant's RFC." *Herrera v. Astrue*, No. 11 C 8593, 2012 WL 4120485, at *7 (N.D. Ill. Sept. 19, 2012). In this case, the ALJ considered the medical evidence, Plaintiff's credibility, and the physical and mental RFC assessments in the record. And again, Plaintiff does not articulate which specific aspects of the ALJ's RFC determination were incorrect.

---

[3] House also complains that at step 5, the VE was expressly told to disregard any information in the medical record and that the hypothetical question posed to the VE failed to include any limitations in those records. House's argument is directed toward the ALJ's step 5 analysis, but it is actually related to the RFC conclusion. The ALJ's hypothetical was intended to elicit whether there are any jobs available to a person with House's RFC, the determination of which had already been made. House's other step 5 argument is a repeat of his credibility argument. House contends that the ALJ failed to explain why he did not consider the VE's testimony that there would be no jobs available to House if his claims were deemed credible. But the ALJ found House not to be credible, and thus the VE's conclusions in this vein are irrelevant to the decision.

## CONCLUSION

For the foregoing reasons, Plaintiff Anthony House's motion for summary judgment [Doc. No. 45] is denied, and the Commissioner's cross-motion for summary judgment [Doc. No. 52] is granted.

**SO ORDERED.**                                **ENTERED:**

**DATE:   September 26, 2012**      _____

                                              **HON. MARIA VALDEZ**
                                              **United States Magistrate Judge**

21